**JONES AND LAUGHLIN STEEL CORPORATION, Appellant,**

v.

**SEDALIA INDUSTRIAL LOAN AND INVESTMENT COMPANY, a corporation, and Claude L. Boul, Appellees.**

**No. 17070.**

United States Court of Appeals
Eighth Circuit.
March 21, 1963.

Julius M. Meyerhardt, and McCormick V. Wilson, Jefferson City, Mo., for appellant.

Donald S. Lamm, and John T. Martin, Sedalia, Mo., for appellees and John C. McCloskey, Sedalia, Mo., was on brief.

Before VOGEL, BLACKMUN and RIDGE, Circuit Judges.

VOGEL, Circuit Judge.

Jones and Laughlin Steel Corporation, plaintiff-appellant herein, instituted this suit to recover $22,235.68, the balance due on the purchase price of a shipment of steel, together with a like amount for punitive damages. It alleges fraud and deceit against the defendants-appellees, claiming fraudulent misrepresentations and concealments by the defendants induced them to make the shipment. Diversity of citizenship and amount involved satisfy federal jurisdiction.

Defendants moved under Rule 56 of the Federal Rules of Civil Procedure, 28 U.S.C.A., for summary judgment, basing such motion upon the facts appearing from allegations of plaintiff's amended complaint, the deposition of the plaintiff's officer A. E. Freed, exhibits identified and offered in connection therewith, plaintiff's answers to interrogatories of the defendants, exhibits identified in and attached to such answers, and uncontroverted facts appearing from the answers of defendant Boul to plaintiff's interrogatories. The District Court, taking that view of the record most favorable to the plaintiff, determined that no genuine issue of any material fact remained, that defendants were entitled to judgment as a matter of law and granted defendants' motion. Plaintiff brings this appeal from the final judgment entered thereon.

The undisputed facts as disclosed by the record and upon which the motion for summary judgment was based are as follows: Precision Manufacturing Company (hereafter Precision) was engaged in business in Sedalia, Missouri. On June 24, 1958, it placed an order with plaintiff for 150 tons of steel of a specified quality, said order to be delivered in three separate installments or "heats". Only the one single order was placed.

At the time of placing its order, Precision was being financed by the Third National Bank of Sedalia. Upon inquiry and upon being informed that the Third National Bank intended to advance money to Precision to finance its operations, plaintiff agreed to ship the first heat, the price of which was $11,639.08. Precision made a pre-payment of $5,000 and credit was extended for the remainder upon standard steel terms.

Subsequent to this shipment, Precision entered into a warehouse agreement with the St. Paul Terminal Warehouse Company (hereafter St. Paul or warehouse) and also entered into arrangements with the defendant Sedalia Industrial Loan and Investment Company (hereafter Sedalia Industrial) to finance Precision for the purchase price of materials. On November 24, 1958, Precision deposited with the warehouse a certain amount of steel then in its possession to the account of Sedalia Industrial. This was the only deposit made and it was exhausted on January 19, 1959, although the actual arrangement was not terminated until February 20, 1959, at which time St. Paul gave notice thereof because of unpaid past due charges.

On November 25, 1958, A. E. Freed, an assistant treasurer of plaintiff, called Precision to inquire about the $6,639.08 payment then in arrears on the first heat. He was referred to defendant Claude L. Boul, who was president of Sedalia Industrial. Freed testified:

" * * * the purpose of my dealings with Mr. Boul and the Sedalia Industrial Loan & Investment Company in the first place were to obtain some further assurance the cash

would be available to Precision Manufacturing Company for the payment of our bills, in that, as a new company, I mean there had been no credit established by that company, there was nothing upon which I could grant credit to that company alone, so that it was necessary to obtain from a third party information as to their intent on the financing of this operation."

Boul told Freed that his company, Sedalia Industrial, was advancing loans to Precision; that there was a warehouse plan in agreement between St. Paul and Precision; that the prospects of Precision's business success were good; that one week prior thereto he had become a director of and officer of Precision and had purchased stock in Precision. Subsequently Boul did make very substantial personal loans to Precision. Freed informed Boul that as a result of the method of financing or the establishment of the financing of Precision he would approve the orders for January delivery as soon as he received the $6,639.08 which was past due on the first heat. (This amount was actually paid three days later.) Freed admitted that he realized that title to the steel would pass to Precision under a field warehousing plan but that he believed that the defendants in their own best interest would not allow its release from the warehouse until payment.

Boul testified that neither his company, Sedalia Industrial, nor he himself personally had entered into any warehousing agreement with St. Paul but that the warehouse did have instructions from Precision to issue warehouse receipts to Sedalia Industrial. He added that the field warehouse set-up on the premises of Precision did issue receipts to his company. Boul could not say whether any such steel came from the plaintiff. Boul also testified that his company did not rely upon the warehousing agreement for security but looked to a factor's lien and certain chattel mortgages for such, although the company had hopes that the warehousing plan would eventually become operative as security. Nor did Boul

place any reliance upon the warehousing agreement in his capacity as an officer of Precision.

On the same day as the phone call from plaintiff's agent, Freed, to Boul, the defendants and Precision entered into a factor's lien method of financing, although there is no indication whether such decision was reached before or after the phone call. In any case, the factor's lien was not mentioned in the phone conversation between Boul and Freed or at any subsequent negotiations between the two. The factor's lien agreement (Missouri Statutes § 430.270 V.A.M.S.) was subsequently recorded in compliance with the law of the State of Missouri.

On January 9 and 16, 1959, the second heat of steel was invoiced and sent to Precision. The third heat was sent on February 4 and 7, 1959. On February 9th, approximately thirty days after the first shipment of the second heat, Freed attempted to contact Boul concerning an overdue payment for the January shipment. He was unable to reach him but received a letter from Boul dated the same day which read as follows:

"PRECISION MANUFACTURING
COMPANY, INC.
"Precision Screw Machine Products
"208 Industrial Drive
"Phone TA 6–0001
"Sedalia, Missouri

"Charles T. Reisdorph, Pres.
"David Stratton, Secretary
"John L. Paser, Treasurer

"February 9, 1959

"Mr. A. E. Freed
"Assistant Treasurer
"Jones & Laughlin Steel Corp.
"Box 4606
"Detroit 34, Michigan

"Dear Mr. Freed:

"A member of our office force advised me this afternoon that you had called about payment of invoices for steel which was shipped by your firm on January 16, 1959. I am holding three invoices for a total of $13,-

591.02. As I understand it, you are concerned about when payment would be made.

"If I am wrong I hope you will advise me but it was my understanding that since the field warehouse plan had been set up with St. Paul Terminal Warehouse Company we were allowed 30 days in which to pay our invoices to you. The going is still a little rough but we are making good progress and we hope to regain your confidence in us reasonably soon. As I mentioned, please advise me if I have misinterpreted the warehouse plan.

"Yours very truly,
"(signed) Claude L. Boul
"Claude L. Boul, Treasurer

"Clb :bd"

The February shipment was still in transit at this time. Boul was called by Freed again on February 24 and March 3, 1959, and the former again referred to the delay in receiving the warehouse receipts. Boul explained that his reference to the warehousing agreement and warehouse receipts was made because of Freed's emphasis upon the warehousing plan, and his desire to show good faith in attempting to get the invoices paid. A substantial payment on the January shipment was made by defendants and the balance was paid by Precision.

Thereafter Precision, unable to meet its obligations, went into bankruptcy. There were insufficient funds to pay unsecured creditors and plaintiff received no payment for the third shipment. It is for the purchase price of that shipment plus punitive damages that this action is brought. Defendants, as secured creditors under their factor's lien and various chattel mortgages, were offered some protection. Boul received a small reimbursement on his personal loans but Precision still owes him $43,017.83.

It is plaintiff's contention that defendants owed plaintiff the duty to reveal the existence of the factor's lien agreement and that they misrepresented as to the warehouse plan for financing.

In granting the defendants' motion for summary judgment, the District Court found that there was never any understanding between the parties that Sedalia Industrial would pay the purchase price of the steel and that Sedalia Industrial's only representations concerned the fact that they were making certain loans to Precision. The court also stated that it could see no actionable fraud in the statements concerning field warehousing and the withholding of the information concerning the factor's lien as credit had previously been extended to Precision and no greater protection would have been afforded the plaintiff under the former method of financing.

We think the District Court was entirely sound in determining that plaintiff was not entitled to recover as a matter of law. Under the law of Missouri, which is controlling herein, the essential elements of actionable fraud are: 1, a representation; 2, its falsity; 3, its materiality; 4, the speaker's knowledge of its falsity or ignorance of its truth; 5, his intent that it should be acted upon by the person and in the manner reasonably contemplated; 6, the hearer's ignorance of its falsity; 7, his reliance on its truth; 8, his right to rely thereon; 9, and his consequent and proximate injury. See Powers v. Shore, Mo., 1952, 248 S.W.2d 1. Each and every one of the elements must be established in order to allow a recovery. Powers v. Shore, supra. This necessity is as applicable to the ninth requirement of "consequent and proximate injury" as to any other element. Lammers v. Greulich, Mo., 1953, 262 S.W.2d 861; Dolan v. Rabenberg, 1950, 360 Mo. 858, 231 S.W. 2d 150; Fisher v. Seitz, 1913, 172 Mo. App. 162, 157 S.W. 883.

The trial court stated in its opinion:

"I am unable to agree with plaintiff's contention that the existence of the warehousing agreement was any protection to the plaintiff. In the first instance, credit had been granted to Precision Manufacturing Company before the warehousing agree-

ment was entered into, before the first shipment had been made and after the first $5,000.00 had been paid.

"The plaintiff could not have determined when or how or under what conditions the material was to be released under the terms of the warehousing agreement; that was solely for the determination of the Investment Company. Legally, therefore, it afforded no protection to the plaintiff.

"Since the warehousing agreement could not have protected the plaintiff, I can see no actionable fraud in the failure of Boul to have advised Freed that the parties were no longer operating under the terms of the agreement."

The admitted purpose of plaintiff's communication with Boul and with Sedalia Industrial was to ascertain whether or not Precision was going to be financed by them. It was exactly the same sort of inquiry plaintiff made of the Third National Bank of Sedalia, which originally was to finance Precision. Subsequent to the communications between Boul and plaintiff which plaintiff claims contained the fraudulent misrepresentations and concealments, both Sedalia Industrial and Boul made very substantial loans to Precision. Neither the warehousing agreement nor the factor's lien represented any protection to the plaintiff, so we are unable to see where it made any difference to plaintiff that it was not advised of the existence of the factor's lien. There is here a failure to produce any facts which indicate a "consequent and proximate injury" resulting from defendants' alleged misrepresentations or concealments. Since the security arrangements between defendants and Precision offered no protection to the plaintiff, the actual form of such security could have no significance in causing plaintiff's loss. There being no possibility of plaintiff's being entitled to recover under these facts, this case is

Affirmed.